CLARK AND FRENCH, PLAINTIFFS IN ERROR, v. A. W. TEN-
NANT, DEFENDANT IN ERROR.

1. **Fraud**: RESCISSION OF SALE ON GROUNDS OF. In order to avoid a
sale on the ground of fraudulent representations, they must be of a
matter material to the contract, and by which the purchaser was
misled or deceived, and but for which the contract would not have
been made.

2. ———: ———. Fraud is never presumed but must be clearly
proved in order to entitle a party to relief, on the ground that it
has been practiced upon him.

3. ———: ———. When a seller of personal property who honestly
believed that a mortgage, which he knew had existed against it,
had been canceled or suffered to lapse, represents to the purchaser
that it is free from incumbrance, but turns out that he was mis-
taken, this will not entitle the purchaser to rescind the contract
when he has used the property for several months without any
molestation, especially if the seller is ready and able to remove
the incumbrance at once, or to give ample indemnity against
loss.

4. ———: ———: EVIDENCE. When the purchaser of a large quan-
tity of hotel furniture claims the right to rescind the contract and
force the property back upon the seller, on the ground of fraud in
the sale, it is proper on cross-examination to ask him whether his
landlord had not terminated his lease and taken possession of the
house about the time of the attempted rescission.

5. ———: ———. If a party has derived a material advantage from
a partial performance of a contract, he cannot hold such advan-
tage and rescind the contract, but must seek his remedy in
damages.

ERROR to the district court of Douglas county. The
facts in the case are substantially as follows: Tennant,
the defendant in error, in April, 1874, bought of Clark
& French, plaintiffs in error, the furniture of the Wyom-
ing Hotel, in Omaha, for the sum of $7,000. He was to
pay in cash at the time of the purchase $1,000. He only
paid $350. He gave notes for the balance of $6,000,
secured by a chattel mortgage on the goods bought.

The total amount paid on the purchase price by Tennant, with the addition of $35 interest, was $1,385. The remaining notes of $5,000 and $650 due on first payment remained unpaid. Prior to Tennant's purchase, and on the 30th day of January, 1873, F. A. Higby and Ira Higby, who then owned the furniture, mortgaged it to one Paddock for $5,000, and this mortgage with accompanying notes was assigned to Reuben Ross, of New York City, before the purchase by Tennant. The lease of the hotel and the furniture came into the possession of Clark & French, at which time the amount due on the Higby mortgage was $6,000. Prior to December, 1873, considerable payments were made upon the mortgage, the exact amount of which is not shown, but Clark testified he thought it was about $3,000. In December, 1873, Ross, the holder of the mortgage, called upon Clark & French and asked them to indorse their guaranty upon the notes, which they did. In January, 1874, the mortgage was re-filed in the clerk's office by attorneys signing themselves "as agents and attorneys for F. A. Paddock, the mortgagee."

Upon the purchase of the property by Tennant, together with the lease, he entered into possession and run the hotel until November 23, 1874. On that date he served a written notice on Clark & French rescinding the contract and demanding repayment of amount paid and the surrender of his notes, and tendering back the property. Clark & French refused to comply but caused the property to be sold under the chattel mortgage given them by Tennant. The net proceeds of the sale amounted to $759.50. Tennant brought this action to recover. damages on account of these transactions.

Upon a trial before SAVAGE, J., the jury returned a verdict against plaintiffs in error for $7,877.16, from which defendant in error remitted $6,112.60 and judgment was rendered for the balance. Motion for a new

trial overruled. Exceptions. Cause brought here upon petition in error.

*George W. Doane*, for plaintiff in error, reviewed the evidence at length, and in support of instructions asked' for on his behalf, and refused by the court, cited the following cases: *Cromwell v. Wilkinson*, 18 Ind., 365. *State v. McCauley*, 15 Cal., 429. *Crossgrove v. Himmelrich*, 54 Pa. St., 203. *Mitchell v. Sherman*, 1 Freem. Ch., 120. 2 Pars. on Contr., 191. *Barnett v. Stanton*, 2 Ala., 181. *Peters v. Gooch*, 4 Blackf., 515. *Teter v. Hinders*, 19 Ind., 93. *Conner v. Henderson*, 15 Mass., 319. *Masson v. Bovet*, 1 Denio, 69. *Brown v. Witter*, 10 Ohio, 142. *Moore v. Bare*, 11 Iowa, 198. *Potter v. Titcome*, 22 Maine, 300. *Shaeffer v. Sleade*, 7 Blackf., 184. *Pettus v. Roberts*, 6 Ala., 811. *Hammond v. Buckmaster*, 22 Vt., 375. Chitty on Contr., 678–752. *Burge v. Cedar Rapids R. R. Co.*, 32 Iowa, 101. *Ripley v. Hazelton*, 3 Daly (N. Y.), 329. *Sanborn v. Batchelder*, 51 N. H., 426. *Gatling v. Newell*, 9 Ind., 578. *Colson v. Smith*, Id., 9. *Underwood v. West*, 52 Ill., 397. *Mullin v. Bloomer*, 11 Iowa, 360. *Moore v. Turbeville*, 2 Bibb, 602. *Saunders v. Hatterman*, 2 Iredell Law, 32. *Farrar v. Alston*, 1 Dev., 69. 1 Story's Eq. Jur., secs. 197–200.

*J. O. Adams* and *E. Wakeley*, for defendants in error, cited: *Smith v. Richards*, 13 Pet., 26. *Hazard v. Irwin*, 18 Pick., 95. *Bennett v. Judson*, 21 N. Y., 238. *Buford v. Caldwell*, 3 Mo., 477. *Thomas v. McCann*, 4 B. Mon., 601. *Morehead v. Eades*, 3 Bush., 121. *Mead v. Bunn*, 32 N. Y., 275. *Litchfield v. Hutchinson*, 117 Mass., 195. *Graves v. National Bank*, 10 Bush., 25. *Wilcox v. University*, 32 Iowa, 367. *Reed v. Divin*, 7 Ind., 189. *McCormick v. Malin*, 5 Blackf., 522. *McClellan v. Scott*, 24 Wis., 81. *Bryant v. Simonean*, 51 Ill., 324. *Knauss v. Shiffert,*

58 Pa. St., 152.   *Masson v. Bovet*, 1 Den., 69.   *With-ner v. Greene*, 9 How., 213, 31.   *Shackleford v. Hand-ley*, 1 A. K. Marsh, 497.

LAKE, CH. J.

Tennant's action in the court below depended entirely upon the establishment of *fraud* on the part of Clark & French in the sale of the goods.   It was solely on the ground of fraud that he sought to recover.   This being the vital point in the case, and the one upon which it must 'eventually turn, it may be well to consider it at the outset of our examination.

It is an established rule that, to avoid a contract on the ground of fraud in the suppression of the truth, or the suggestion of falsehood, there must be a conceal-ment of something which the seller is bound to commu-nicate to the purchaser, or some misrepresentation on a matter material to the contract which misled or de-ceived him, or was calculated to do so, and but for which the contract would not have been made.

. In the view we take of the case, it is wholly unneces-sary to determine whether the steps taken to renew the Higby mortgage were adequate to preserve its lien upon the property in favor of Ross, the assignee, or not.   We shall therefore treat it as a subsisting lien for the amount actually due thereon at the time of Tennant's attempted rescission of the contract.

But, notwithstanding this mortgage had not been can-celed, and still bound the property which it covered for whatever remained due to Ross, the testimony very clearly establishes the fact that after Clark & French had given their indorsement upon the notes, Ross at once abandoned all idea of relying upon the mortgage for payment, or as a security.   And we are satisfied that Clark & French, from what transpired between them-selves and Ross, might have reasonably understood and

believed that the mortgage had been permitted to lapse, and at the time of their sale to Tennant had ceased to be a lien upon the property. Let us look to some of the testimony bearing upon this branch of the case.

Mr. Clark testified that, in December preceding the sale to Tennant, Ross called upon Clark & French and informed them that he was the owner of the Higby mortgage. He said it had then "nearly lapsed," and that he would not give the snap of his finger for it. Ross further said to them, "I want you to indorse these notes (the ones secured by the mortgage) to secure me. The mortgage is nearly out, *and I wont bother any more with it.*" An understanding was then come to, Clark & French indorsing the notes, and Ross, in consideration thereof, extended the time of payment for several months longer. Clark, in addition to this, swears positively that he did not know at the time of the sale to Tennant that the mortgage was an existing lien against the property, but supposed it had lapsed by limitation. Clark's version of what took place between them and Ross concerning the mortgage is not denied by any one, but is supported by Ross himself in his deposition. He says: "After Clark & French had bought the goods covered by said mortgage, I made inquiries as to their financial standing and concluded to accept their indorsement to the notes, as I considered the notes good with their indorsement, *without the mortgage.* I may have told them I did not want to have any trouble with the mortgage." And to show that he looked alone to Clark & French for payment, and did not intend to look to the property for security, he says he did not authorize his attorneys to re-file the mortgage, nor did he even think of it.

This transaction with Ross, as before stated, took place in December, 1873, and in view of what was there said and done, and of the additional fact that there was no

question as to their liability on the notes, or of their ability to pay them, Clark & French may have well understood, and really believed, that the mortgage had lapsed and become a nullity, as it certainly would have done as to Tennant, at least, if the course had been pursued respecting it indicated by the declaration of Ross, that he *"would bother no more with it."* That they did so believe is abundantly shown, *first*, by the uncontradicted testimony of Clark himself to that effect; and *second*, by the great surprise manifested by both Clark & French, as shown by Tennant's own testimony, when informed that the mortgage was still alive. We think that these facts and circumstances of themselves, independently of the positive denial of Clark that he made the statement imputed to him concerning incumbrances, are sufficient to show beyond all doubt that Clark & French acted towards Tennant in the utmost good faith, and with perfect fairness throughout the entire negotiation.

But this is not all. There are other facts which throw additional light on the question, and greatly fortify us in the conclusion that the attempt to fasten fraud upon Clark & French was a signal failure. We will briefly allude to them. Clark & French were, it is conceded, of sufficient financial ability to pay the Ross claim, and were actually doing so as fast as they conveniently could in view of the almost total failure of Tennant to meet his notes, upon which they had greatly depended. They also retained the ownership of Tennant's notes, and notwithstanding they needed the money due thereon, actually let them run past maturity until, at the time of the attempted rescission of the contract, over three thousand dollars—inclusive of a portion of the thousand dollars which should have been paid down—was actually due and unpaid. This sum was more than sufficient to have fully satisfied the balance then due upon the mortgage which

Tennant was so surprised to find upon his goods. In this whole transaction we have failed to discover in the conduct of Clark & French a single one of those ear-marks usually attending the perpetration, or the attempt to perpetrate a fraud, by one person upon another. The commission of fraud is usually with a view to gain; of profit at the expense of him against whom it is directed. But here there is nothing of that sort. Had Clark & French, immediately upon the consummation of the trade, disposed, or endeavored to dispose, of Tennant's notes; or had they pressed them promptly to collection as they became due; or if they had evinced a disposition at any time to cast upon Tennant the burden of advancing his money before the maturity of his notes in order to protect his property from sacrifice, there would have been some excuse for this charge of fraud.

The negotiations for this sale occupied several days, and were finally consummated about the 1st day of April, 1874. The notes given for the purchase money bear that date, and we think it is fair to presume that it was then fully agreed upon. The testimony shows that there was a little delay in the delivery of the papers in consequence of the absence of Stevenson, who was expected to sign two of the notes. But this delay was only for a day or so. Now there is nothing in the testimony, not even in that of Tennant himself from which it can be inferred that a single word had been said up to this time, as to there being any incumbrance upon the property by mortgage or otherwise. The first suggestion of this kind came from Stevenson after the negotiations had ended, and the terms of sale were fully agreed upon. On this point Tennant swore that "the question was asked in this way, I think it was asked by Mr. Stevenson, 'What is he getting?' and the answer was, 'All the furniture in the house except the safe and piano.' I

asked if there was any incumbrance on the property, and he said, 'No, it is all clear.'"

Now this is an important circumstance to show that the subject of incumbrances was not thought of until the contract was fully agreed upon, and Stevenson was called in to affix his name to two of the notes. It shows that Tennant was not at all anxious on that subject, or it would not have been left to Stevenson to first broach the matter.

But did he consider it of any importance? In view of his own testimony, and all the surrounding circumstances we think not. The responsibility of Clark & French was well known to him, and he doubtless understood that they were perfectly able to make good the title which their sale to him implied that they had to the property. Indeed when the question was put to him by his counsel, evidently with the expectation that he would give a negative answer, whether he would have bought the property if he had known of the mortgage, he could not answer *directly* that he would not, but he qualified his answer by saying he "would not without assuming the mortgage." It is unquestionably the law, and it should be strictly enforced, that, where any one by willful misrepresentation induces another to enter into a contract under the belief that such representation is true, a fraud is committed which will not be tolerated. It is doubtless a question of much nicety in most cases to determine just what misstatement will, or will not, vitiate the contract. It is safe to say, however, that, in order to avoid a contract on this ground, there must not only have been a misrepresentation of a material fact constituting the basis of the transaction, but the party complaining must have made the contract upon the faith and credit of such representations. "At least he must so far have relied upon them that he would not have made the contract if such representations had not been

made." *Phipps v. Buckman*, 30 Penn. St., 402. *Taylor v. Fleet*, 1 Barb., 471.

Another rule of the law which should not be overlooked is that fraud is never to be presumed, but must be clearly proved in order to entitle a party to relief on the ground that it has been practiced upon him. *Howe v. Howe*, 99 Mass., 89. We are of the opinion that in this case there was not only an absolute failure to establish the fraud charged, but, on the other hand, that it was abundantly shown that Clark & French acted throughout the transaction as honest and fair minded men.

As this conclusion will result in a new trial being ordered on the ground that the verdict is clearly against the weight of the evidence, we might perhaps stop here without noticing the other assignments of error. But there are two or three that deserve a passing notice, to which we will allude very briefly.

On his cross-examination, Tennant was asked in substance whether the owner of the hotel which he had been keeping had not taken possession of it before he notified Clark & French of his rescission of the sale. This question was ruled out on the ground of immateriality.

We think the question was a proper one and that it should have been answered. If the house in which Tennant had kept and used these goods, consisting as they did of hotel furniture, had been or was about to be taken from him so that he was under the necessity of seeking another place in which to use or store them, this might furnish a satisfactory clue to his evident anxiety to get rid of them and at the same time to escape paying the notes given on their purchase. He had had the use of them for some six months, had paid but a very small portion of the price, and if the time had come when they could be of no immediate use to him it would be more profitable, doubtless, to crowd them back upon Clark & French at the contract price, than to pay his

notes and sell them at auction or otherwise for what he could get. There was error in refusing to permit this question to be put.

So, too, we think there was error in refusing to permit certain questions to be propounded to the witness Pritchett on his cross-examination. This witness had testified in chief that during the time he had charge of the Higby mortgage he had not heard it had been released or waived. On cross-examination he was asked whether Clark & French, from the first time they learned that steps had been taken to foreclose it, did not claim to him that it had been released and waived? We see no reason why this question was not entirely proper. What the witness had said in chief was calculated to lead the jury to believe that Clark had no idea that the mortgage had been waived by Ross, or else why did he not so claim to his attorneys when they took steps to enforce it? And this, it is evident, was the purpose for which this testimony was called out by Tennant's counsel. Now it is very clear that it was the right of the defendants to show that this was not the fact, and thus prevent the inference that might, and probably would, be drawn from it, if not denied. And in what way could this be so satisfactorily done as on a cross-examination of the same witness if it were successful?

It is claimed also that there was error in certain instructions given to the jury, and likewise in the refusal to instruct on several points as requested on the part of the plaintiffs in error.

As to those given by the court, on its own motion, we discover no fatal objection except in the fifth and fourteenth. The fifth was in these words: " If you believe that Clark & French stated that there was no incumbrance upon the property when there was in fact a mortgage upon it, which mortgage was known to them, and if you believe: that such statement was in regard to a

material matter and influenced Tennant in making the contract, then you would be justified in coming to the conclusion that there was a fraudulent statement which would enable Tennant on discovery of the fraud to rescind the contract." This instruction had a direct tendency to cause the jury to disregard entirely the belief of Clark & French, no matter how firmly and honestly impressed upon their minds, that Ross had permitted the mortgage to lapse and intended to look alone to them for payment. It being a conceded fact, not at all denied by Clark & French, that they knew of the Higby mortgage, this instruction brushed away every vestige of their defense and left them nothing whatever to stand upon. We think it was clearly erroneous.

The fourteenth instruction related to the mode of arriving at the damages to be allowed to Tennant in case the jury found that he was entitled to rescind the sale. This instruction was defective in not including in the amount to be deducted from the purchase price, in addition to the unpaid notes, also that portion of the first payment of one thousand dollars which was still in arrear. The whole sum remaining unpaid, upon the basis adopted by the court, should have been taken into the account whether represented by notes or not.

There were several instructions requested by the plaintiffs in error, and refused by the court, which we think ought to have been given. One of them was in these words: "If one party has derived an advantage from a partial performance of a contract, he cannot hold such advantage and rescind the contract, but must seek his remedy in damages." This is undoubtedly the law, and in view of the fact that Tennant had used this property, in running his hotel for over six months, the rule contended for was strictly applicable. Again, to the same point was the following: "And one seeking to rescind

on the ground of fraud must offer to restore benefits" derived from his purchase.

The testimony shows that as soon as Tennant discovered this mortgage on the record, without waiting to ascertain whether the amount which it was intended to secure had been paid, and without any consultation with Clark & French in relation to the matter, he rushed to a lawyer and took steps to secure an immediate rescission. This is not the course that common honesty and fair dealing would have dictated, and it is a strong circumstance to show that Tennant must have known prior to his pretended discovery of the mortgage that it was at least a nominal lien upon the property. It is not every mortgage that is found of record that is a real incumbrance on the property which it covers. It is not unfrequently the case that they are suffered to remain long after the money which they secured has been fully paid. Even in this case the testimony shows that a very considerable portion of what appeared to be due by the records had been paid, and that as to the whole debt it had been materially modified, even if not discharged, by the arrangement between Ross and Clark & French. The testimony also shows that, at the very first mention of the fact to Clark & French that the mortgage had been renewed, they not only expressed great surprise, saying there must be some mistake about it, but they unhesitatingly declared that they would indemnify and protect Tennant against any loss or damage whatever. Several other points were urged upon our attention on the argument, but having touched upon those which we deem the most important and controlling ones, we do not consider it necessary to notice them. For these reasons the judgment of the district court is reversed and a new trial awarded.

REVERSED AND REMANDED.