Lane v. Starkey.

·comes strictly within the rule of *caveat emptor*. Cooley on Taxation, 329–375. *Lynde v. Melrose*, 10 Allen, 49.

JOHN T. LANE, PLAINTIFF IN ERROR, v. JACOB STARKEY, DEFENDANT IN ERROR.

| 15 | 285 |
|----|-----|
| 18 | 477 |
| 20 | 587 |
| 15 | 285 |
| 35 | 457 |
| 15 | 285 |
| 52 | 282 |

1. **Sale:** FRAUD: BONA FIDE PURCHASER. One W., intending to hinder and defraud his creditors, sold his stock of goods and book accounts to S., taking his notes therefor, S. being aware of and sharing in the fraudulent intent. S., twenty days afterwards, having information that an attachment was about to be levied on the goods as the property of W., sold the same to S., an employe, taking his notes therefor. *Held*, On the facts proved, that S. was not a *bona fide* purchaser.

2. ——: ——: BURDEN OF PROOF. The burden of proving a valuable consideration is upon the purchaser when proof of that fact becomes necessary to his protection against creditors.

ERROR to the district court for Saline county. Tried below before MORRIS, J.

*Brown & Ryan Brothers*, for plaintiff in error, reviewed the testimony at length, and cited, *inter alia: Temple v. Smith*, 13 Ind., 514, and cases cited. Burrill Assignments,. § 341. Bump., 89. *Glenn v. Glenn*, 17 Iowa, 501.

*Hastings & McGintie*, for defendant in error, cited: *Thornton v. Hook*, 36 Cal., 223. *Nichols v. Patten*, 18 Me., 231. *Fifield v. Gaston*, 12 Iowa, 218. *Clark v. Tennant*, 5 Neb.,. 557. *Howe v. Howe*, 99 Mass., 89. *King v. Moon*, 42 Mo., 551. *Linn v. Wright*, 18 Tex., 317. *Waterbury v. Sturtevant*, 18 Wend., 353. *Kittle v. St. John*, 10 Neb.,. 605. *Hedman v. Anderson*, 6 Neb., 400. Bump on Fraudulent Conveyances, 563. *Atwood v. Impson*, 5 C. E. Green, 150. *Seymour v. Wilson*, 19 N. Y., 417. *Shontz: v. Brown*, 27 Pa. S., 123. *Pattison v. Stewart*, 6 W. and S., 74.

MAXWELL, J.

In July, 1882, one F. M. Woodruff had a store containing general merchandise at Friendville, in this state, and was embarrassed by his liabilities. The total amount of his debts at this time seems to have been about $4,000, and the value of the stock the testimony shows to have been from $2,700 to $4,000, while the book accounts were from $300 to $1,200. Woodruff was indebted to one Stone, who kept a bank at that place, a little over $200 for money loaned. Woodruff's creditors were pressing him very hard at this time, when he sold his entire stock, including the book accounts, to Stone for $2,000, which was paid by deducting the amount Woodruff was owing Stone, and by Stone giving his promissory notes for the balance—one of said notes for $500, with interest, due in six months; one:

note for $500, without interest, due in twelve months; one for $500, without interest, due in eighteen months, and a note for the remainder, without interest, due in two years. Stone, at the time of the alleged purchase, had full notice of the debts owing by Woodruff, and the testimony clearly shows that one of the objects he had in view in purchasing said goods was to hinder and delay if not defraud the creditors of Woodruff. This transaction took place on the 6th of July, 1882. There is considerable testimony tending to show that Stone did not purchase the goods absolutely, but merely to secure his own claim, and to enable Woodruff to settle with his creditors. This is denied by Stone, but is sustained by the clear weight of testimony, and it certainly seems very strange that a merchant should sell his entire stock for not to exceed one-half of its face value, and receive as payment therefor only long time notes without interest. Certain creditors of Woodruff threatened to attach these goods to secure their claims, and Stone, evidently alarmed, made several efforts to sell the same before the attachments were levied. On the 26th of July, 1882, he was informed that an attachment was about to be levied on the goods in question, and he at once went to a man named Hugh Seed, and offered to sell him the goods for $2,500, taking his notes therefor, payable in one, two, three, and four years. Mr. Seed agreed to take the goods on these terms, and the parties went to the store where the goods were kept, and the notes were drawn up ready to be signed, when Seed, evidently anticipating trouble if he purchased the goods, refused to take them and sign the notes. This was between two and three o'clock in the afternoon of the 26th. Stone thereupon sold the goods to one Starkey for $2,500, taking his notes therefor, payable to himself. Immediately after this alleged sale, Starkey and the former clerk employed by Woodruff and Stone commenced to invoice the goods, the invoice being completed on the following Sunday. In the forenoon of the 27th of July,

an attachment was levied upon a portion of the goods in question as the property of Woodruff, the amount levied upon being $714.95. This action was brought by Starkey against the officer levying the attachment to recover the value of the property seized under the order. A verdict was rendered in favor of Starkey in the court below, and a motion for a new trial having been overruled, judgment was entered on the verdict. The question for determination in this court is, was Starkey a *bona fide* purchaser of the goods in question?

It appears from the testimony that he was an employe of Stone at $16 per month and board, at the time of this purchase; that he had been in the employ of Stone at Friendville for about two years; that prior to that time he had resided with his father in Hamilton county, and he states in his testimony "a part of the time I milled it,"—tended mill for his brother. It nowhere appears that he possessed any property whatever. Nor does the testimony show that at the time of the levy on the goods in question, he had paid one cent thereon. But it is said he gave his negotiable promissory notes for the goods, and that this is sufficient to prove a valuable consideration. Whether negotiable promissory notes given under the circumstances of this case would be sufficient or not, we will not determine, as the record nowhere shows such notes to have been given. It is in evidence that notes were given to J. D. Stone, but no copy is set out nor does their character appear. It does appear, however, that Stone, knowing that an attachment was about to be levied, hurriedly sells these goods to Starkey, who knew but little or nothing about the business —the alleged purchase being made in the afternoon or night of July 26th, and the notes given at that time, while the invoice was made afterwards. No reason is given why the invoice was not made before the sale, but it is apparent that the reason was the fear of Woodruff's creditors, and the testimony tends to show that there was suf-

ficient under the circumstances to put Starkey upon inquiry. The question of a *bona fide* purchase has been before this court a number of times.

In *Gregory v. Whedon,* 8 Neb., 377, it is said: "In order to constitute a person a *bona fide* purchaser he must have parted with something that is valuable upon the faith of his purchase before he had notice of any prior right or equity;" and in *Savage v. Hazard,* 11 Id., 327, it is said, "to constitute a *bona fide* purchase for a valuable consideration, it must be without notice, and with the money actually paid." In both of these cases the purchasers had given their promissory notes, but the sales were held to be invalid. The rule is well settled that the burden of proving a valuable consideration is upon the purchaser when proof of that fact becomes necessary to his protection against either creditors or subsequent purchasers. 1 Am. Leading Cases (4th Ed.), 53. *Battle v. Jones,* 2 Ala., 314. Abbott's Trial Ev., 448-9 and cases cited in notes. This Starkey has failed to do. It is stated in the defendant's brief that it devolves upon the plaintiff to show that the transactions between Woodruff and Stone, and Stone and Starkey, were fraudulent. It is a fundamental principle that fraud is never presumed—that is, when a sale is alleged to be fraudulent as to creditors it devolves on the party alleging the fraud to prove it. But the proof of fraudulent intent need not extend beyond the vendor and vendee. The question as to a purchase from a fraudulent vendee is whether or not he acted in good faith. If he did, he is protected. If he did not so purchase, the goods in his hands are still liable for the debts of the real owner. That is, the goods in the hands of the fraudulent vendee were liable for the vendor's debts. Therefore, if one purchase with notice of the vendee's title, or have facts sufficient to put him upon inquiry, he takes merely the title possessed by the vendee. There may, however, be an intent also on the part of such purchaser to defraud or aid in defrauding the creditors of the

vendor which may be proved to show his want of good faith. The testimony in this case fails to show that Starkey was a *bona fide* purchaser, and therefore entitled to protection, and for that reason the judgment must be reversed. As there must be a new trial in this case, we desire to say that the cross-examination of both Stone and Starkey was too much restricted. In cases of this kind the facts can only be ascertained by a full examination of the witnesses. Then, too, the very large number of objections interposed by the attorneys, almost in the same form to all questions, seem to have been unnecessary. It is the duty of an attorney to protect the rights of his client by proper objections and exceptions; but this does not authorize nor require continued and persistent objections to proper and competent testimony. The judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

COBB, J. concurs.

LAKE, CH. J., dissenting.

This cause comes here from Saline county. The action in the court below was brought by the defendant in error to recover damages for an alleged wrongful seizure by the plaintiff in error of a portion of his stock of goods under an order of attachment.

The order of attachment was issued to the plaintiff in error, as sheriff, at the suit of *Samuel P. Farmington et al. v. Francis M. Woodruff*, who a short time before had been engaged in the mercantile business in Friendville, in said county, and from whom the defendant in error had, mediately, obtained the goods in question. The intervening purchaser from Woodruff was J. D. Stone, who was one of his creditors. The defendant in error was in possession of the goods when the attachment was levied, and he

claimed to own them under a sale from Stone. The defense interposed was that the defendant's title had been obtained in fraud of Woodruff's creditors, and that the goods were therefore attachable, as belonging to him, in satisfaction of their demands. The jury, however, found otherwise, and judgment was rendered accordingly. The only question for present consideration is simply whether the verdict is supported by the evidence.

If we were dealing only with the sale from Woodruff to Stone, if the verdict rested on that alone, it is quite probable it could not be sustained. For although Stone doubtless had for one object, in making the purchase, the payment of his own small demand against Woodruff, I think the evidence shows beyond all reasonable doubt that he had the further object of unjustly benefiting himself at the expense of Woodruffs creditors, by getting his stock of goods for several hundred dollars less than they were really worth, and to that extent, if not altogether, defeat them in the collection of their claims. These claims were pressing upon Woodruff, and Stone knew it; they amounted to about four thousand dollars. The goods transferred to Stone, as Woodruff testified, were worth about thirty-eight hundred dollars, and the book accounts about one thousand dollars more. Stone paid for them both two thousand dollars by the satisfaction of his own demand of about three hundred dollars, and his four promissory notes, three for five hundred dollars each, payable in six, twelve, and eighteen months, and one for about two hundred dollars, payable in two years without interest. This was clearly a fraudulent transaction, and voidable at the suit of Woodruff's creditors.

But was the defendant in error aware of the fraudulent character of Stone's title when he took it? In other words, did he know that one of Stone's objects in buying the stock was to defeat, hinder, or delay Woodruff's creditors in the collection of their claims? Or rather, as the question is

presented to this court, can the refusal of the jury to so find on the evidence before them be sustained?   I think it can and should be.

It is a principle of universal recognition that in the absence of proof fraud is never to be presumed.   Therefore, if the right of a party in a suit depends upon the establishment of fraud in another, he must prove it in order to succeed.   The burden of proof is on him whose success depends on showing the fraud.   *Clark et al. v. Tennant,* 5 Neb., 549.   3 Wait's Actions and Defenses, 445, § 12.

Such being the law by which the case is to be judged, what is the evidence to which it is to be applied?   Conceding that Stone was a fraudulent purchaser, all that was shown beyond this was simply that the defendant in error had resided in Friendville about one year before he purchased the goods, during which time he had been in the employ of Stone or his son, running a flour and feed store at sixteen dollars per month and board.   Before going to Friendville he had lived in Hamilton county about three years, working in his brother's mill.   This is all that was shown of Starkey's antecedents, and nothing whatever as to his financial ability or standing.

Stone, after his purchase from Woodruff, had run the store about twenty days when he proposed to sell out to Starkey.   He had endeavored to sell to other parties.   Finally Starkey concluded to purchase on the terms offered him, which were the payment of twenty-five hundred dollars for the stock then on hand, for which he gave his promissory notes payable in six, twelve, eighteen, and twenty-four months, all except the first being without interest.   This sale was completed and Starkey in possession of the goods before the attachment was levied.   It is not shown that before the levy of this attachment Starkey knew or had reason to believe that Woodruff was in embarrassed circumstances, or even that he had a single creditor in the world.   The stock so purchased by Starkey invoiced be-

tween twenty-seven and twenty-eight hundred dollars. Surely there is nothing in all this tending in the least degree to impeach the motives of Starkey in making the purchase, or that evinces a purpose to aid in defrauding the creditors of Woodruff.

But there is one other item of evidence which seems to be the chief reliance of the plaintiff in crr ir to show bad faith on the part of Starkey. It is found in the deposition of Woodruff, taken in the jail in the city of Chicago, where he was then confined at the instance of the plaintiffs in error, presumably—although this is not clear—for alleged dishonesty in contracting the debt on which the attachment issued.

It seems that Woodruff, after his sale to Stone, was in the habit of being about the store, and rooming there. This was continued for awhile after the sale to Starkey, and after the service of the order of attachment in this case. In his examination on behalf of the plaintiff in error, Woodruff was asked whether Starkey objected to his being there, and answered that he did. To the question "What objection did he make, if any?" he answered, "If I can state just what he said—he said that it would let the cat out of the bag, or give the thing away, and that there would more parties attach."

This is all, and I think that, even if it were not contradicted, it falls far short of showing fraud in Starkey's purchase. If the phrase, "let the cat out of the bag," or "give the thing away" were really used, what was meant by it is merely conjectural. It is not at all clear that Woodruff himself knew what idea was intended to be conveyed by it, for on cross-examination on this point, he says:

Q. You say that Mr. Starkey objected to your being in the store?

A. Yes, sir.

Q. You say his objection was that it would let the cat out of the bag; what did he mean by that?

Objected to, and not answered.

Q.    Do you know anything about what he meant by that?

A.    I had an idea.

Q.    You don't know; you had no conversation with him about it?

A.    No.

Q.    You know nothing further than that?

A.    No.

But while Starkey admits he told Woodruff that he did not want him about the store, he denies that he made use of the words "let the cat out of the bag," or "give the thing away." And there being but these two witnesses as to what was said, the jury might well have concluded that no such language was used, especially so after Woodruff's admission that he had consented to give his testimony for the plaintiffs in error while in jail, under the promise "that Mr. Farrington would try and get him out." Starkey says, in his testimony on this subject, "I told him I didn't want him there because it would make people think he had an interest in there, and they would come upon me." That he had such apprehension of the tendency of Woodruff's presence in the store, and so stated to him, after learning by the levy of one attachment that he was really indebted, and that the goods were being treated by his creditors as still belonging to him, are not very remarkable, nor inconsistent with the utmost good faith on his part. And Starkey says further of Woodruff's reputed ownership, that about two days before he bought the goods he saw Woodruff at the store one evening, and said to him, "Frank, there is a good deal of talk around town about your having an interest in this store, and I want to know about it; and he says, 'Jake, I don't want any such talk, I have no interest in here.'" This inquiry was very natural, and, as I think, shows no fraud on his part. He saw Woodruff still about the store, and heard people suggesting

that he still had an interest in it, although Stone was the ostensible owner. Under these circumstances, being well acquainted with Woodruff, ordinary inquisitiveness, even if he had no thought of purchasing the goods, would doubtless have prompted the inquiry. Woodruff, however, assured him that he had no interest there, and he doubtless believed it. And even as to this supposed interest which Starkey had heard talked of, there is not a particle of evidence that he believed, or had any reason to believe it was fraudulent as to creditors, for, as before stated, it is not shown that he knew until after the attachment was levied, that Woodruff had any creditors.

After a careful consideration of the evidence, I am entirely satisfied that as to the defendant in error it is not sufficient to overcome the legal presumption of innocence to which he is entitled, and to beget a belief in a reasonable mind that, in making the purchase, he committed a fraud. At all events, it is clearly not such as will justify this court in saying that a jury of twelve men, sustained by the judgment of the trial judge, were manifestly wrong in finding it was not. Therefore the verdict should be sustained, and the judgment affirmed.